ROSALIE CAMPIONE & others[1] vs. R. LINDSAY WILSON & others.[2]

Barnstable. November 8, 1995. - February 27, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

Negligence, In obtaining insurance policy, Insurance agent. Contract, Insurance, To obtain insurance, Insurance agency, Third party beneficiary. Assignment. Release.

Discussion of cases considering the viability of an insured's assignment of claims against an insurance broker for excess liability incurred as a result of the broker's alleged negligence in failing to secure insurance coverage, in circumstances in which the assignee has released the insured from liability as part of an agreement for judgment. [189-192]

In the circumstances of a negligence action against an insured in which the insured assigned to the plaintiffs, as part of a settlement agreement in which the defendants were released from liability, its claims against its insurance broker for excess liability incurred as a result of the broker's alleged negligence in failing to secure insurance coverage, the assignment was effective: considering the policy, assignment and release together, the risk of collusion appeared minimal, where the judgment was in excess of the policy limits already paid in full, damages were substantial, liability was reasonably clear, and the plaintiffs had voluntarily assumed the burden of proving any claims the insured might have. [192-194] O'CONNOR, J., dissenting.

Claims by third-party beneficiaries to alleged oral agreements for insurance coverage between a tortfeasor and its insurance agents were not foreclosed by the holding of Mowles v. Boston Ins. Co., 226 Mass. 426, 428-429 (1917), where the tortfeasor itself would not be precluded from recovering on its alleged agreements by reason of its receipt without objection of written insurance policies that did not comply with its requests for coverage, inasmuch as the brokers were not parties to the insurance contracts: the tortfeasor's claims were independent of the policies actually issued. [194-196] O'CONNOR, J., concurring.

CIVIL ACTION commenced in the Superior Court Department on November 15, 1990.

---

[1]Gina Campione and Charles J. Campione, Jr., as coadministrators of the estate of Charles J. Campione, Sr.

[2]Douglas Cole, doing business as Howland Insurance Agency, and Evans, Prager and Landy Insurance Agency, Incorporated.

The case was heard by *Gerald F. O'Neill, Jr.,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Eric P. Finamore* for Rosalie Campione & others.

*William T. Bogaert* (*Thomas M. Elcock & Andrew Caplan* with him) for Douglas Cole.

*J. Russell Hodgdon* for R. Lindsay Wilson.

*Mary Alice McLaughlin* for Evans, Prager and Landy Insurance Agency, Incorporated.

GREANEY, J. This is a complicated insurance dispute. The plaintiffs, Rosalie Campione and Gina and Charles J. Campione, Jr., coadministrators of the estate of their father, Charles J. Campione, Sr., have brought suit against the defendant insurance brokers, R. Lindsay Wilson (Wilson), Douglas Cole, doing business as Howland Insurance Agency (Howland), and the Evans, Prager and Landy Insurance Agency, Incorporated (Prager), on grounds of (1) negligence for failing to obtain adequate insurance for their client, O'Donnell Sand and Gravel, Inc. (O'Donnell), and (2) breach of contract for failure to obtain optional motor vehicle liability coverage and general liability coverage including excess motor vehicle liability coverage, as requested by O'Donnell. The plaintiffs brought their tort claims as assignees of O'Donnell. They brought their contract claims as assignees of O'Donnell as well as third-party beneficiaries of any insurance agreements and contracts between O'Donnell and the defendants. A judge in the Superior Court granted the defendants' motions to dismiss the negligence claims, under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974),[3] and the defendants' motions for summary judgment on the contract claims, under Mass. R. Civ. P. 56 (b), 365 Mass. 824 (1974), and judgment entered for all the defendants on all claims. The plaintiffs' appeal is before us on direct appellate review. Mass. R. A. P. 11 (a), as amended, 378 Mass. 924 (1979). We vacate the judgment, and remand the case for further proceedings.

1. *Factual background.* The record provides the following background.

---

[3]Because the judge considered matters outside of the pleadings, he granted summary judgment for Wilson on the plaintiffs' claims of negligence against him.

a. *The accident.* The primary business of O'Donnell is the excavation, selling, hauling, and delivery of sand and gravel. On March 2, 1989, Charles J. Campione, Sr., was killed by a tractor trailer belonging to O'Donnell and driven by John Pina, an O'Donnell employee. The plaintiffs have claimed that Campione's death was attributable to negligence on the part of Pina. According to the plaintiffs, the accident occurred after Rosalie Campione and Charles J. Campione, Sr., pulled into the breakdown lane of Route 3 in Norwell to remove a barrel that had become lodged under their automobile. While the Campiones stood next to their vehicle, two tractor trailers owned by O'Donnell, and operated by O'Donnell employees, drove toward them at a high rate of speed. The trucks were traveling in the right-hand travel lane, and the second truck was traveling close behind the first one. As the trucks approached the Campiones, the truck in the rear pulled into the breakdown lane and headed directly toward the Campiones.[4] Mrs. Campione remained "frozen" in the breakdown lane, while her husband attempted to evade the approaching truck by running down the embankment by the side of the highway. Pina, the driver of the second truck, drove down the embankment to avoid the Campione's automobile, running over Campione, who was killed instantly. Mrs. Campione suffered disabling emotional distress attributable primarily to witnessing her husband's death. The plaintiffs brought an action against O'Donnell and Pina in the Superior Court for wrongful death and other claims.

b. *Insurance coverage.* On the date of the accident, O'Donnell's trucks were covered by an insurance policy issued by American Casualty Company (American), which provided coverage up to $250,000 a person and $500,000 an accident. In May, 1987, O'Donnell had specifically asked Wilson to increase the company's motor vehicle liability coverage from $250,000 per person, $500,000 per accident to a combined single limit of $1,000,000. Wilson had complied with this request: prior to June, 1988, the O'Donnell trucks had been covered by a policy issued by Aetna Casualty and

---

[4]The driver of the first truck claimed that an automobile had come to a stop in the right-hand travel lane in front of him. Mrs. Campione denied the existence of any such automobile. With the exception of this dispute, the materials in the record indicate no significant disagreement about the facts of the accident.

Surety Company, which provided motor vehicle liability coverage up to a maximum of $1,000,000. In June, 1988, because he was having difficulty servicing the Aetna policy, Wilson made contact with Howland to obtain coverage for O'Donnell from a different carrier. Howland obtained the policy from American which was in effect at the time of the accident.[5] O'Donnell had not requested a change in carrier or a reduction in coverage.

O'Donnell also had general liability insurance, in the form of two policies obtained through Prager, each providing $500,000 in general liability insurance. Each of these policies, however, excluded coverage for bodily injury or property damage caused by a motor vehicle, although, it is contended, O'Donnell had requested from Prager general liability coverage which would have included coverage for injury to property or person caused by a motor vehicle.

c. *Settlement agreement.* Prior to trial of the underlying action, the plaintiffs and O'Donnell entered into (1) agreements for judgment; (2) assignments; (3) conditional releases; and (4) a settlement agreement. The agreements for judgment provided that judgment would enter for Rosalie Campione in the amount of $1,250,000, and for Gina Campione and Charles J. Campione, Jr., in the amount of $500,000. O'Donnell assigned to the plaintiffs "all of the right, title and interest which the Assignors [O'Donnell and Pina] may have or which they may hereafter acquire, in or to any claim, action or proceeding, arising out of the alleged failure of any person, insurance agency or insurance company, prior to March 2, 1989, to procure adequate insurance coverage for or on behalf of the Assignors to indemnify and protect them from claims arising out of motor vehicle accidents." The "conditional releases" signed by the plaintiffs released O'Donnell from any and all claims attributable to the death of Charles J. Campione, Sr.,[6] conditional on O'Donnell's compliance with the terms of the settlement agreement, which

---

[5]The judge noted a dispute between Wilson and Howland as to whether Howland was informed that O'Donnell had motor vehicle liability coverage of $1,000,000 per accident, and desired to maintain this level of coverage.

[6]In relevant part, the releases "release[d] and discharge[d]" O'Donnell:

"from any and all claims, demands, actions and causes of action of every name and nature which [the plaintiffs] now have or might have

agreement required O'Donnell to cooperate with the plaintiffs "in the pursuit of any claim, action or proceeding brought to enforce any right which the defendants shall have assigned to the plaintiff[s] under the terms of [the settlement agreement]."[7] The settlement agreement also provided for entry of judgment in favor of the plaintiffs for a total of $1,750,000, combined with an undertaking by the plaintiffs not to seek satisfaction from O'Donnell or Pina. As part of the agreement, American, as carrier for O'Donnell's motor vehicle liability policy on the date of the accident, paid out the $500,000 limits of its policy on the plaintiffs' claims.[8] The plaintiffs brought suit in reliance on the assignment and on their status as third-party beneficiaries of alleged agreements by the defendants to procure additional optional motor vehicle liability coverage for O'Donnell.

2. *Negligence claims.* The judge ordered dismissal of the plaintiffs' negligence claims on the ground that O'Donnell had not suffered any tangible damages attributable to the defendants' alleged negligence, and, thus, had no assignable claim. The judge recognized that an insured in the position of O'Donnell would have a claim against an insurance broker for excess liability incurred as a result of the broker's negligence, see *Rae* v. *Air-Speed, Inc.,* 386 Mass. 187, 192-193 (1982), and that entry of a judgment for excess liability could give rise to a claim of damages attributable to a broker's negligence in failing to procure coverage that would be deemed adequate for a company engaged in the excavation and delivery of gravel. See *DiMarzo* v. *American Mut. Ins. Co.,* 389 Mass. 85, 94-95 (1983). The judge, nonetheless, accepted the defendants' position, concluding that because the plaintiffs "had released O'Donnell from liability at the time judgment entered," O'Donnell never was liable for damages

upon or against said [O'Donnell], and especially from all claims arising out of any and all personal injuries, damages, expenses and any loss or damage whatsoever, resulting or to result from an accident which resulted in the death of Charles J. Campione, Sr."

[7] The agreement also provided that its terms would not prevent the plaintiffs from making another claim against O'Donnell if additional applicable insurance coverage was discovered.

[8] The money from American was divided equally between Rosalie Campione and her children, as coadministrators of her deceased husband's estate.

in excess of its available coverage, and, therefore, had no assignable claim.[9]

There is support in case law from other jurisdictions for the judge's reasoning and conclusion. See, e.g., *Freeman* v. *Schmidt Real Estate & Ins., Inc.*, 755 F.2d 135 (8th Cir. 1985); *Oregon Mut. Ins. Co.* v. *Gibson*, 88 Or. App. 574 (1987).[10] For their part, the plaintiffs have referred us to cases involving the somewhat analogous circumstances of an assignment, coupled with an agreement, releasing a tortfeasor from liability, when an insurer has failed to settle a claim within policy limits and judgment enters against the insured in excess of those limits. There is a split in authority as to whether a tortfeasor who has been released from the legal obligation to pay has any right against an allegedly negligent insurer which could be assigned to an injured party. The majority rule, however, is that, in these circumstances, entry of judgment in

---

[9]The plaintiffs could not, and do not, maintain that they have viable direct claims of negligence against the defendants. See *Flattery* v. *Gregory*, 397 Mass. 143, 146-147 (1986).

[10]The facts in the *Freeman* and *Gibson* cases closely resemble the facts in this case. In *Freeman*, the underlying claim at issue was for failure to obtain liability insurance in the amount requested by the insureds. The insureds had "confessed judgment" well in excess of policy limits, the injured party had agreed not to execute against the insureds, and the insureds had assigned to the injured party their right to proceed against the insurance brokers who were alleged to have been negligent. *Freeman* v. *Schmidt Real Estate & Ins., Inc.*, 755 F.2d 135, 137 (8th Cir. 1985). The United States Court of Appeals for the Eighth Circuit, applying Iowa law, concluded that an insured who is insulated from liability has no valid claim to assign to the injured party. *Id.* at 141. In *Gibson*, the parties agreed to a stipulated judgment in excess of available coverage. The third-party plaintiffs entered into a covenant not to execute against the tortfeasor, and the tortfeasor assigned to them a claim against his insurance agents for failure to procure adequate coverage. The Court of Appeals of Oregon affirmed a grant of summary judgment in favor of the insurance agents on the ground that the tortfeasor, who was unconditionally insulated from liability, had no valid claim to assign. *Oregon Mut. Ins. Co.* v. *Gibson*, 88 Or. App. 574, 577-578 (1987).

We note here that the plaintiffs' contention that their settlement agreement with O'Donnell is conditional, and that this fact distinguishes this case from the *Gibson* case, is unpersuasive. The likelihood of the conditions in the settlement agreement (namely, that O'Donnell cooperate with the plaintiffs in their pursuit of any claim O'Donnell might have against its insurance brokers, and that the plaintiffs would be permitted to make a claim against O'Donnell if additional applicable insurance was discovered) not being met is virtually nil.

excess of policy limits coupled with a release (or a covenant not to execute)[11] in favor of the insured, does not invalidate an accompanying assignment of the right to sue the insurer for negligence. See *Gray* v. *Grain Dealers Mut. Ins. Co.*, 871 F.2d 1128, 1132-1133 & n.7 (D.C. Cir. 1989) (applying law of North Carolina and District of Columbia; collecting cases).

For the most part, these conflicting decisions reflect a balancing of policy considerations. The primary rationale of the Eighth Circuit's *Freeman* decision is concern about the risk of collusion when an insured is protected from liability by an agreement not to execute prior to entry of judgment.[12] In these circumstances, the court observed, "the insured . . . loses the incentive to contest his liability or the extent of the injured party's damages either in negotiations or at trial." *Freeman* v. *Schmidt Real Estate & Ins., Inc., supra* at 139. This risk, the court concluded, outweighed the possible benefit of the use of a settlement like the one entered into by the parties. See *Gray* v. *Grain Dealers Mut. Ins. Co., supra* at 1133 (consideration motivating decision in *Freeman* case is fear of collusion between insured and injured party). On the other hand, in the *Gray* decision, the United States Court of Appeals for the District of Columbia Circuit rejected the risk of collusion as a basis for decision. The court reasoned that, when the insurance policy, the assignment, and the release executed by the parties were considered together, the assignment was effective under North Carolina law. *Id.* at 1133. The court was not particularly impressed with what it termed the "somewhat metaphysical contention," *id.* at 1132, that the legal basis for the claim against the insurer disappeared

[11]In *Gray* v. *Grain Dealers Mut. Ins. Co.*, 871 F.2d 1128 (D. C. Cir. 1989), the United States Court of Appeals for the District of Columbia Circuit noted that there is a difference between a release and a covenant not to execute, "as the legal liability remains in force against those who have covenants, whereas a release represents total freedom from liability." *Id.* at 1133 n.7. It also was noted, however, that courts considering the validity of an assignment when the assignor has some shield from liability "have used much the same reasoning [when considering] covenants/assignments as they have when considering release/assignments." *Id.*

[12]The Eighth Circuit also concluded that foreclosing the possibility of assignment in the circumstance of the case was in compliance with standard language in a liability insurance policy which affords coverage for damages an insured is "legally obligated to pay." *Freeman* v. *Schmidt Real Estate & Ins., Inc., supra* at 138. The claim in the *Freeman* case, however, was not a claim for coverage under the terms of the policy.

when the insured became insulated from liability due to a release or a covenant not to execute. *Id.* at 1133. In the circumstances of this case, we consider the reasoning of the *Gray* decision to be more persuasive, and we discern no compelling reason not to recognize the assignment of the negligence claims.

It is clear that, had the underlying tort claim been tried, and a judgment entered in excess of the $500,000 coverage afforded by the American policy, O'Donnell's resulting claim against the defendant insurance brokers could have been assigned. See *DiMarzo* v. *American Mut. Ins. Co., supra* at 93-95; *Larabee* v. *Potvin Lumber Co.*, 390 Mass. 636, 640-641 (1983). We are aware that this case is distinguishable from the *Gray* case, and others, as well as our decision in *DiMarzo*, in the respect that judgment has not entered against O'Donnell after complete litigation of the plaintiffs' underlying claims. Neither the existence of claims against O'Donnell, nor their value, therefore has been established and tested in full adversary proceedings. Nonetheless, we are reluctant to foreclose the possibility of settlement like the one entered into by O'Donnell and the plaintiffs.[13] See *Polaroid Corp.* v. *Travelers Indem. Co.*, 414 Mass. 747, 765 (1993) (acknowledging sensible policy of promoting settlement in appropriate circumstances); *Camp Dresser & McKee, Inc.* v. *Home Ins. Co.*, 30 Mass. App. Ct. 318, 326 (1991). The settlement provides O'Donnell with the benefit of being free from personal liability for amounts beyond its certain insurance limits in exchange for O'Donnell's cooperation in assisting the plaintiffs in their efforts to assert O'Donnell's claims against the defendants. There is an obvious advantage to the plaintiffs in having a cooperative O'Donnell in the litigation against the defendants, rather than forcing O'Donnell to cooperate in the plaintiffs' attempt to reach and apply, or pursue in other ways, the defendants' liabilities to O'Donnell in satisfaction of the deficiency judgment that is probable against O'Donnell. It is appropriate to give effect to agreements which have led to a carefully negotiated and detailed settlement, in which the plaintiffs have voluntarily assumed the burden of proving any claims that O'Donnell might have against the defendants, in a

---

[13]In connection with this point, it is important that American agreed to provide the limits of its coverage, a substantial amount, to aid in settlement of the plaintiffs' claims against O'Donnell.

situation where O'Donnell's liability for the accident is reasonably clear, the primary insurer has paid the full limits of its policy, and damages are substantial.

We do not ignore the risk that, when a prejudgment settlement is combined with a release and covenant not to execute in favor of the tortfeasor, collusion may exist between the injured party and the tortfeasor. See *Glenn* v. *Fleming,* 247 Kan. 296, 318 (1990) (expressing "concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties"). However, the risk of collusion in this case appears minimal in view of the seriousness of the accident, the existence of liability, and the probability that a fact finder will find that damages exceeded any existing insurance coverage. As did the court in the *Glenn* case, we think any risk of collusion can be diminished by requiring the plaintiffs to assume the burden of proof with respect to the claims brought by them, see *id.* at 318-319, citing *Griggs* v. *Bertram,* 88 N.J. 347, 367-368 (1982), and by recognizing that, unlike an insurance company which has failed to defend its insured, these defendants, who were not parties to the settlement agreement, cannot be bound by its terms insofar as it purports to fix their liability. See *Home Indem. Ins. Co.* v. *Merchants Distribs., Inc.,* 396 Mass. 103, 104, 106-107 (1985) (insurer's settlement agreement which imposes costs on insured is not binding on insured who is not party to agreement and has not had opportunity to litigate disputed point). Further, it is open to the defendants to suggest the issue of collusion, and if a satisfactory basis exists, to argue it to the fact finder.

To recover against the defendants, therefore, in addition to proving the essential elements of their negligence claim against them, the plaintiffs will have to establish O'Donnell's fault for accident (at least because the question of comparative fault may be in dispute and may affect the measure of damages), and they must prove the extent to which their damages exceeded the coverage afforded by American. We do not consider the settlement agreement as probative on any of these points, particularly damages. See *Steil* v. *Florida Physicians' Ins. Reciprocal,* 448 So. 2d 589, 592 (Fla. Dist. Ct. App. 1984). Placing with the plaintiffs the responsibility of proving their assigned claims in full reduces the risk of collusion, and justifies giving effect to the assignment of the

negligence claims. We conclude that the plaintiffs' negligence claims should not have been dismissed.

3. *Contract claims.* The plaintiffs brought their contract claims as third-party beneficiaries (as well as assignees) of alleged agreements and contracts between O'Donnell and the defendants.[14] We have held that injured travelers are intended beneficiaries of optional motor vehicle insurance coverage, see *Flattery* v. *Gregory*, 397 Mass. 143, 150-151 (1986), and may recover against an insurance agent who has failed to obtain the coverage requested by a negligent insured. *Id.* It also is settled that, as third-party beneficiaries of alleged agreements between O'Donnell and the defendants, the plaintiffs "stand in the shoes of O'Donnell." See *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 196 (1982), citing Restatement (Second) of Contracts § 309 (1981). Thus, the defendants may raise against the plaintiffs any defense they would have had against a claim by O'Donnell. See *id.*

Reasoning that this court's decision in *Mowles* v. *Boston Ins. Co.*, 226 Mass. 426, 428-429 (1917), would have foreclosed O'Donnell's claims against the defendants, the judge granted summary judgment to the defendants on the plaintiffs' contract claims. According to the judge, "The *Mowles* case stands for the proposition that any oral contract between an insurance professional and an insured ceases once the contract is reduced to writing and the insured has had a reasonable time to review the policy." Because O'Donnell had received the policy from American on or before its effective date of July 15, 1988, some seven months before the accident, and had received the two general liability policies obtained through Prager early in 1988, the judge concluded, as matter of law, that O'Donnell had had a reasonable time to review the policies and that the policies, therefore, superseded any oral agreement between O'Donnell and the defendants.

In the *Mowles* case, an agent of the plaintiff asked an agent of the defendant insurance company to change the name on an insurance policy. The defendant's agent agreed to do so, but returned the policy to the plaintiff's agent without having made the change. The plaintiff, who suffered an uninsured

---

[14]Because the plaintiffs could bring their contract claims as third-party beneficiaries based on the decision in the case of *Flattery* v. *Gregory*, 397 Mass. 143 (1986), we need not consider whether O'Donnell could assign to the plaintiffs breach of contract claims against the defendants.

loss because of the agent's dereliction, attempted to recover on the agent's oral promise to alter the policy. This court rejected the claim, stating that "[t]here [was] no room for reasonable inference that, after that formal instrument in writing was returned [and the insured had had reasonable time to examine the policy], the pre-existing oral arrangement still subsisted." *Id.* at 428. We conclude that the decision in *Mowles* does not apply to the defendants.

The decision in *Mowles* turned on the policy's being viewed as a counteroffer from the insurer, which the plaintiff accepted by not rejecting the policy, as written, within a reasonable time. Here, the breach of oral contract suits against the defendant brokers are independent of the policies issued by the insurance companies. There can be no contention that O'Donnell accepted counteroffers from the defendants, who, as brokers, were not parties to the insurance contracts.

The conduct of one's own insurance broker is tested by a different standard than the one applied to an insurance company. "An insurance broker is the agent of the insured in negotiating for a policy . . . ." 16A J.A. Appleman & J. Appleman, Insurance Law and Practice § 8841, at 171 (1981). A broker owes a greater duty to an insured than does an insurance company. See *Kap-Pel Fabrics, Inc.* v. *R.B. Jones & Sons*, 402 S.W.2d 49, 57 (Mo. Ct. App. 1966). When an insured makes an agreement with a broker calling for the purchase of particular coverage, the insured may reasonably rely on the broker's superior expertise and may assume that the broker has performed his duty. See *Kap-Pel Fabrics, Inc.* v. *R.B. Jones & Sons, supra* at 58; *Franklin* v. *Western Pac. Ins. Co.*, 243 Or. 448, 452-453 (1966). See also 3 G. Couch, Insurance § 25.60, at 404-406 (rev. 2d ed. 1960). Accordingly, a "broker cannot claim that the oral contract to procure insurance was merged into the written policy" (footnote omitted). 16A J.A. Appleman & J. Appleman, Insurance Law and Practice, *supra* at § 8843, at 228. See *Harris* v. *A.P Nichols Inv. Co.*, 25 S.W.2d 484, 487-488 (Mo. Ct. App. 1930); *White* v. *Calley*, 67 N.M 343, 345 (1960); *Franklin* v. *Western Pac. Ins. Co., supra*. See also *Riddle-Duckworth, Inc.* v. *Sullivan*, 253 S.C. 411, 423 (1969) (cases involving actions between

insured and insurer not controlling in insured's suit against broker).[15]

Although an insured is entitled to rely on his broker as his agent, an insured cannot abandon all responsibility for ascertaining the terms of the coverage his broker obtained. See *Kap-Pel Fabrics, Inc.* v. *R.B. Jones & Sons, supra* at 58. See also *First Nat'l Ins. Agency, Inc.* v. *Leesburg Transfer & Storage, Inc.*, 139 So. 2d 476, 480-481 (Fla. Dist. Ct. App. 1962). In appropriate circumstances, an insured may be estopped from recovering against a broker on an oral contract when a written policy does not comply with the parties' oral agreement. The existence of estoppel, however, generally is a question of fact, see *Quality Fin. Co.* v. *Hurley*, 337 Mass. 150, 155 (1958); *Capozzi's Case*, 4 Mass. App. Ct. 342, 347 (1976), that depends on all the circumstances of the transaction, such as the nature of the relationship between broker and the insured, the reasonableness of the parties' conduct, and the insured's sophistication and experience. Cf. *John Hancock Mut. Life Ins. Co.* v. *Schwarzer*, 354 Mass. 327 (1968). We cannot conclude, as matter of law, that O'Donnell would have been precluded from recovering on its alleged oral agreements with the defendants by reason of its receipt without objection of written insurance policies that did not comply with its requests for coverage.[16]

4. *Conclusion.* The judgment is vacated, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

O'CONNOR, J. (concurring in part and dissenting in part). The plaintiffs seek recovery from the defendant insurance agents on both tort and contract theories. I agree that the plaintiffs may be entitled to recover on their third-party beneficiary contract claims despite O'Donnell's not having

[15]To the extent that the United States Court of Appeals for the First Circuit has suggested that cases applying the doctrine of *Mowles* v. *Boston Ins. Co.*, 226 Mass. 426 (1917), might apply in a suit between an insured and a broker, see *Ciaramitaro* v. *Gough & King, Inc.*, 250 F.2d 943, 945 (1st Cir. 1958), we disagree with the suggestion on a point of State law.

[16]Responsibility for the proof of damages on the plaintiffs' contract claims also rests with the plaintiffs and would require the same proof as has been previously discussed in connection with the negligence claims.

sustained any loss. Therefore, as the court does, I would vacate the judgment as to the third-party beneficiary contract claims and remand those claims for further proceedings. I do not agree, however, that the judgment should be vacated and further proceedings conducted with respect to the assigned tort and contract claims.

As a matter of law, O'Donnell's tort claims are without merit because, as the judge observed in his memorandum of decision, "under the terms of the settlement agreement, O'Donnell was never liable for the amount of judgment in excess of the available insurance coverage." Any failure of the defendants to satisfy their duty to O'Donnell to exercise reasonable care for O'Donnell's benefit did not result in damage to O'Donnell. Such negligence, therefore, as a matter of law did not result in O'Donnell's having a meritorious tort claim which O'Donnell could assign to the plaintiff. Surely, the plaintiffs should not be regarded as having meritorious claims against the defendants sounding in tort for negligence based on the plaintiffs' alleged losses due to the defendant insurance agents' failure to fulfil duties they owed, as a matter of law, not to the plaintiffs but to O'Donnell alone.

The principle that the plaintiffs received by assignment no more viable a tort claim than O'Donnell possessed, applies equally to the plaintiffs' contract claims based on assignment from O'Donnell (as distinguished from third-party beneficiary claims). O'Donnell could not convey what O'Donnell did not have. Having suffered no loss as a result of the defendants' alleged failure to obtain the insurance coverage the defendants had contracted to obtain, the defendants had no contract claim (other than for nominal damages, perhaps) to transfer to the plaintiffs.